**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**DEAN JACKSON KINDER,**

    **Plaintiff,**

**v.**                                                             **Civil Action No. 5:15cv50
(Judge Stamp)**

**JAMES RUBENSTEIN, Commissioner;
PAT MIRANDY, Warden; and DANIEL
KIMBLE, Unit Manager,**

    **Defendants.**

## REPORT AND RECOMMENDATION

### I. Background

On April 24, 2015, the *pro se* plaintiff, an inmate at the St. Marys Correctional Center ("SMCC"), in St. Marys, West Virginia, initiated this case by filing a filing a civil rights complaint against the above-named defendants pursuant to 42 U.S.C. §1983, along with a motion to proceed *in forma pauperis* ("IFP") with supporting documents. The plaintiff was granted permission to proceed as a pauper on April 29, 2015. On May 6, 2015, plaintiff filed a motion or leave to file discovery. He paid his initial partial filing fee on May 26, 2015. On May 27, 2015, the undersigned conducted a preliminary review of this matter and determined that summary dismissal was not appropriate. Accordingly, an Order to Answer was entered, and twenty-one (21) day summonses were issued for each of the defendants. The same day, by separate Order, plaintiff's motion for leave to file discovery was denied.

On July 7, 2015, the defendants filed an answer to the complaint. On July 15, 2015, plaintiff filed a motion to appoint counsel, along with a reply to the defendants' answer. By Order entered July 28, 2015, plaintiff's motion for appointed counsel was denied. On July 30,

2015, without having filed a motion to dismiss, the defendants filed a Memorandum in Support of Defendants' Motion to Dismiss. By Order entered August 3, 2015, the defendants were directed to file a motion to dismiss and the plaintiff was given a date to respond. On August 4, 2015, the defendants filed a motion to dismiss. Plaintiff filed a response on August 13, 2015, along with another motion for leave to file discovery. On August 19, 2015, plaintiff filed another motion to appoint counsel. By separate Orders entered the same day, plaintiff's second motion for appointed counsel and second motion for leave to file discovery were denied.

## II. The Contentions of the Parties

### A. The Complaint

In his complaint, filed without a memorandum in support, the plaintiff contends that in October, 2014, he was assigned to be the paid SMCC Handicap Assistant for inmate ["R.D."],[1] who plaintiff contends was obviously seriously mentally ill. Plaintiff avers that R.D. immediately began a pattern of mental abuse toward him, accusing him regularly of

> holding his wife and son captive and repeatedly raping them here in the prison. He also believed that we (the inmates) were in a 1980s coal camp and that he was the boss. [R.D.] . . . would suddenly approach others and accuse them of having done something to him or his family and wish to fight[;] . . .would approach [plaintiff] . . . in a threatening manner and make these accusations in full view of the inmates and security staff. Nothing was done to curtail this behavior by staff . . . [R.D.] slept very little and roamed the halls all night long . . . [carrying] around a folder with his papers . . . stating his fear someone would steal them . . . [he] would not go outside for recreation for fear the aliens would come to get him. The level of his mental illness was such that a more therapeutic environment of supervision was necessary. The basic treatment plan of staff was to simply go along with [R.D.'s] . . . delusions and send him on his way. [Plaintiff] . . . was constantly reminded by the Unit Team that [R.D.] . . . was speaking 'out of his mind' and [plaintiff] . . . needed to tolerate his wanderings.

---

[1] The other inmate is referred to herein by his initials to protect his privacy.

2

Dkt.# 1-3 at 1 - 2. Plaintiff avers that due to his sleeping in the bed right next to R.D., there was no escape from R.D.'s continuous mental harassment[2] and his "pleas to the Unit Team to make other arrangements for R.D. went unanswered."[3]

Plaintiff avers that on the afternoon of February 18, 2014 [sic], he and another inmate spoke with Correctional Officer II ("C.O.") Schultz,[4] regarding the potential of R.D. to act out his violent thoughts. He avers that his concerns were "merely noted."[5] The following morning, February 19, 2014 [sic],[6] while plaintiff was at the ironing board in the 76-1 dayroom, without warning, R.D. suddenly attacked him, punching him repeatedly in the face, chest, back and ribs. Plaintiff alleges that he sustained physical and mental injuries in the attack, including apprehension; mental duress; contusions; lacerations; a split lip; bloody nose; rib bruising; back sprain, and an unspecified effect on his pre-existing heart trouble. He avers that the C.O.s did not rescue him until they yelled for R.D. to stop and "some time later . . . arrived to contain . . . [R.D.]."[7]

After the assault, plaintiff was taken to the Medical Department and treated; R.D. was removed from the unit and placed in solitary, until he was transferred to another facility.[8]

---

[2] Plaintiff attaches a copy of W.Va. Division of Corrections ("WVDOC") Inmate Grievance Form, dated February 16, 2015, in which he states "I am being verbally abused and threatened on almost a daily bases [sic] now by Inmate . . . [R.D.]. This is now bordering on a Federal Hate Crime level. Telling me how he would like to kill the baby raper. I am not the only person he is threating [sic] now. He's now being aggressive [sic] to other people in the room and the pod." *Relief Sought:* "This man needs to be moved out of the room if not the pod. He need [sic] to receive mental help and needs to be contained before he hurts someone badly." Dkt.# 1-1 at 3.

[3] Dkt.# 1-3 at 1.

[4] C.O. Schultz is not a named defendant.

[5] Dkt.# 1-3 at 1.

[6] It is apparent from the copy of an administrative remedy attached to the complaint that this is a typographical error in the complaint, and the assault actually occurred on February 19, 2015. See Dkt.# 1-1 at 1.

[7] Dkt.# 1-1 at 2.

[8] Dkt.# 1-3 at 1.

Accordingly, plaintiff raises these claims:

1) failure to protect;

2) deliberate indifference;

3) failure to provide adequate safety measures;

4) failure to train staff in procedures to prevent violence; and

5) failure to take appropriate action through the grievance system.

The plaintiff maintains that he has exhausted his administrative remedies with regard to these claims. He attaches copies of two administrative grievances as proof.

As relief, the plaintiff seeks $10,000.00 in compensatory damages and $25,000.00 in punitive damages from each defendant, as well as "other damages yet to be determined or claimed."

## B. The Defendants' Answer

In response to the complaint, the defendants assert a number of defenses, and contend that because the complaint fails to state a claim upon which relief can be granted, it should be dismissed.

## C. Plaintiff's Reply

In his response, the plaintiff argues that the defendants exceeded the time allotted to respond. He emphasizes that he is also suing the defendants in their "personal and individual capacities." He reiterates his arguments and attempts to refute the defendants' on the same, and for the first time, asserts constitutional violations. Finally, he concurs in the defendants' request for a jury trial.

## D. Defendants' Motion to Dismiss

Defendants contend that the complaint should be dismissed because

1) it fails to state a claim upon which relief can be granted, because the defendants are entitled to sovereign immunity and/or qualified immunity;

2) the defendants are not persons for purposes of §1983;

3) the defendants did not deprive plaintiff of any Constitutional right, nor did they violate any clearly established law;

4) the conduct in question consisted of discretionary acts; and

5) plaintiff's instant complaint, like his nearly identical state court complaint, which was dismissed on appeal for failure to state a claim by the West Virginia Supreme Court of Appeals ("WVSCA"),[9] is frivolous and should be dismissed.

### E. Plaintiff's Response to the Defendants' Motion to Dismiss

Plaintiff reiterates his arguments and attempts to refute the defendants' on the same.

## III. Standard of Review

### A. Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

---

[9] See Dkt.# 24 at 12. However, the undersigned notes that plaintiff's court-approved form complaint denies having ever filed any other lawsuit in state or federal court dealing with the same facts involved in this action. See Dkt.# 1, §IV(A) at 5. The undersigned has searched and found no record of such a case, and a call to the WVSCA confirms that no such case was ever filed with the WVSCA, let alone decided.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," (Id.). (citations omitted), to one that is "plausible on its face," (Id. at 570), rather than merely "conceivable." (Id.). Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. (Id.).

### IV. Analysis

## A. Commissioner James Rubenstein

Plaintiff contends that defendant Rubenstein failed to take appropriate action to ensure his safety, and failed to respond appropriately to his grievance. He contends that Rubenstein's denial of his grievance over the attack[10] "demonstrated the deliberate indifference to the violence perpetrated upon the plaintiff."[11] In somewhat unclear and contradictory support of this claim, Plaintiff contends that

> [p]rocedures are written by this Defendant in the manner in which violence will b_ avoided when dealing with other inmates and, especially, the mentally infirm. Defendant Rubenste__ failed to insure that such procedures were in place and used to prevent the injury suffered by this Plaintiff even following notification to staff through the Unit Team.

Dkt.# 1 at 8.

Here, other than alleging that Rubenstein was deliberately indifferent because he denied plaintiff's grievance over the attack, plaintiff's only other allegation against Rubenstein is in his reply to the defendants' Answer, where he alleges that Rubenstein "constructed policy which allows the care of inmates by inmates."[12] However, assuming this to be true, plaintiff has not shown that it was his role as R.D.'s Handicap Assistant that put him at risk, given his allegation that R.D. habitually freely verbally abused and threatened other inmates as well.[13] In plaintiff's response to the defendants' dispositive motion, he cites to a purported WVDOC Policy Directive 426.00, for the proposition that it

---

[10] Although plaintiff does not specifically state it was only Rubenstein's denial of the February 19, 2015 grievance that is at issue, a careful examination of both grievances reveals that despite Plaintiff's claim that he filed his grievances to all three levels, it is apparent that Plaintiff did not pursue his February 16, 2015 grievance regarding R.D.'s verbal threats to the third level, so Rubenstein would have been unaware that R.D. posed any danger to plaintiff until the assault had already been committed.

[11] Dkt.# 1 at 8.

[12] Dkt.# 21 at 13.

[13] Dkt.# 1-3 at 1.

7

allows for the housing of "mildly mentally ill patients on their 'sheltered housing unit' (W.V. Code 62-13-4) minted [sic] 4-1-15, pertinent text reads: ". . . to maintain a mechanism that provides housing and assistance for inmates who may not be appropriate for general population due to some physical or mental impairment."

Dkt.# 31 at 6 – 7. The undersigned notes that there appears to be no WVDOC Policy Directive 426.00 and W.Va. Code §62-13-4 says nothing of the kind.

Accordingly, the undersigned construes Plaintiff's claim as an allegation that Rubenstein was deliberately indifferent for denying his February 19, 2015 grievance regarding the attack. Review of that grievance indicates that Plaintiff's Unit Manager Kimble's response was that "[o]n 2-18-15 the unit team met with you to discuss these issues. You were removed as . . . [R.D.'s] assistant and reassigned to another inmate. You were offered the opportunity to move to another room or housing unit. You insisted that movement wasn't necessary."[14] Despite Plaintiff's claim that his "pleas to the Unit Team to make other arrangements for R.D. went unanswered[,]"[15] it appears that Plaintiff's pleas were not ignored. Given that R.D. was immediately removed to segregation and then from SMCC altogether, there was no further action to take to protect the plaintiff from him, and therefore, Rubenstein's affirmance of the Warden's decision was appropriate at that time. See Dkt.# 1-1 at 1.

This defendant must be dismissed because the complaint fails to state an actionable claim against him. There is no *respondeat superior* liability under §1983. See Monnell v. Department of Social Services, 436 U.S. 658 (1978); see also Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1997). Instead, "liability will lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." Vinnedge, *supra.* Nonetheless, when a

---

[14] Dkt.# 1-1 at 1.

[15] Dkt.# 1-3 at 1.

8

supervisor is not personally involved in the alleged wrongdoing, he may be liable under §1983 if a subordinate acts pursuant to an official policy or custom for which he is responsible. Fisher v. Washington Metropolitan Area Transit Authority, 690 F.2d 1113 (4th Cir. 1982). Similarly, a supervisor may be liable under §1983 if the following elements are established: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.), cert. denied, 513 U.S. 813 (1994).[16] Here, Plaintiff has not shown that Rubenstein had any awareness, prior to the February 19, 2015 Inmate Grievance, that R.D. posed any danger to him. Accordingly, Rubenstein cannot be liable under §1983.

Finally, to the extent that the plaintiff may be asserting that Rubenstein was deliberately indifferent to his needs because he "rubber stamped his usual indifference"[17] by not granting plaintiff's February 19, 2015 Inmate Grievance, that claim is without merit because that is not the type of personal involvement required to state a claim. See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003).

Because the plaintiff fails to allege any personal involvement on the part of this defendant, and does not make any allegations which reveal the presence of the required elements

---

[16] "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." Shaw, 13 F.3d at 799. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" Id.

[17] Dkt.# 21 at 7).

for supervisory liability, plaintiff fails to state a claim against Commissioner Rubenstein, and the Motion to Dismiss as it relates to him should be granted.

**B. <u>Qualified Immunity</u>**

Defendants Mirandy and Kimble and argue that they are entitled to qualified immunity. With regard to qualified immunity, the United States Supreme Court has provided that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Pritchett v. Alford</u>, 973 F.2d 307, 312 (4th Cir. 1992). The analysis of the defense of qualified immunity is examined using a two-step analysis. <u>Saucier v. Katz</u>, 533 U.S. 194 (2001). The first step is to determine whether the facts alleged show that the defendants' conduct violated a constitutional right. <u>Id</u>. at 201. If the facts so viewed do not establish a violation of a constitutional right, the plaintiff cannot prevail, and "there is no necessity for further inquiries concerning qualified immunity." <u>Id</u>. However, if a favorable view of the facts does establish such a violation, the next step is to determine whether the right violated was clearly established at the time of the alleged offense. <u>Id</u>. If the right was not clearly established, the defendants are entitled to qualified immunity. <u>Id</u>.

Here, Plaintiff alleges that Unit Manager Kimble failed to protect him from attack by inmate R.D. on February 19, 2015. Plaintiff also impliedly alleges, without providing any supporting detail, that unspecified C.O.'s failed to respond quickly after the attack began. The defendants do not dispute that the plaintiff was assaulted by another inmate on that date.

Deliberate indifference on the part of prison officials to a specific known risk of harm states an Eighth Amendment claim. <u>Pressly v. Hutto</u>, 816 F.2d 977, 979 (4th Cir. 1987).

However, not every injury suffered by an inmate at the hands of other inmates translates into constitutional liability for the prison officials responsible for the Plaintiff's safety. See Farmer v. Brennan, 511 U.S. 825, 835 (1994)(holding that a prison official may be held liable only if he "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."). The test is not whether an official knew or should have known of the possibility of harm, but whether he did in fact know of it and consciously disregarded that risk. "[T]he official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. While the objective information known to the official may be used to infer the knowledge he actually had, and to draw inferences about his actual state of mind, those inferences are not conclusive.

Federal courts have accepted the general proposition "that an isolated attack by one prisoner upon another does not constitute cruel and unusual punishment and that an isolated (negligent) act or omission by a prison official (or guard) which allows an attack to occur is not constitutionally actionable." See, e.g., Woodhous v. Virginia, 487 F.2d 889 (4th Cir. 1973); VanHorn v. Lukhard, 392 F.Supp. 384, 387 (E.D. Va. 1975), citing Penn v. Oliver, 351 F.Supp. 1292 (E.D. Va. 1971). "(E)ven if a prison official fails through his negligence to prevent an act of violence, a violation of constitutional right is not of necessity stated. To the contrary, there must be a showing either of a pattern of indisputed and unchecked violence or, on a different level, of an egregious failure to provide security to a particular inmate, before a deprivation of constitutional right is stated. An isolated act or omission by a prison official that allows an attack to occur and which involves only simple negligence does not, absent special circumstances, (state a cause of action under Section 1983.)" Penn v. Oliver, *supra* at 1294. C.f., Inmates,

11

Washington County Jail v. England, 516 F.Supp. 132, 139-40 (E.D. Tenn. 1980); Knight v. People of the State of Colorado, 496 F.Supp. 779, 780 (D. Colo. 1980).

Here, Plaintiff has failed to show his Eighth Amendment rights were violated because he has not shown that Defendant Kimble knew of a substantial risk of serious harm to him and consciously disregarded that risk. Plaintiff has not made any allegation showing that Defendant Kimble knew that inmate R.D. was going to assault him on February 19, 2015. Although Plaintiff alleges that as early as October, 2014, he "informed . . . Kimble that . . . [R.D.] was becoming increasingly violent towards ___[,]"[18] nowhere does he allege that R.D. ever did anything more than verbally abuse and threaten him, albeit "on almost a daily basis."[19] Further, despite his claims that he notified Kimble "as early as October, 2014," the only Inmate Grievance he ever apparently filed on the issue before the assault was three days before it occurred, on February 16, 2015, indicating that he apparently tolerated R.D.'s behavior for four months before ever complaining. In response to the February 16, 2015 grievance, Kimble stated that "[p]er our meeting on 2-18-15, you are no longer assigned to assist inmate . . . [R.D.]. You also requested that your bed assignment not be changed. Please let us know if you have any other issues."[20] Plaintiff signed this response on February 18, 2015. Again, this response contradicts Plaintiff's claim that his "pleas to the Unit Team to make other arrangements for R.D. went unanswered."[21] Although Plaintiff's affidavit states that R.D. would

> suddenly approach others and accuse them of having done something to him or his family and wish to fight . . . [and that] . . . R.D. would approach me in a

---

[18] The text of the allegations in the complaint, even when the original is examined, are all cut off on the right margin, thus, it is unclear what plaintiff's final words were here. See Dkt.# 1 at 7.

[19] Dkt.# 1-1 at 3.

[20] Dkt.# 1-1 at 3.

[21] Dkt.# 1-3 at 1.

> threatening manner and make these accusations in full view of other inmates and in front of security staff. Nothing was done to curtail this behavior by staff. The incidents were reported to the Unit Team which includes Defendant Kimble, Mr. Jason Collins and others.

Dkt.# 1-3 at 1, Plaintiff does not allege that R.D. ever had a history of violence, or that at any time prior to the February 19, 2015 assault, inmate R.D. had ever assaulted anyone before. Plaintiff has failed to show there was any reason for Unit Manager Kimble to take this February 16, 2015 incident as anything other than another empty threat or attempt at harassment. To the contrary, it would appear that Plaintiff was content with Kimble's response, and he, as well as Kimble, apparently believed at that time that R.D. was merely making verbal threats that he had no intent to act on.

It is apparent from the record, then, that Defendant Kimble was not deliberately indifferent to his safety needs: upon the filing of Plaintiff's February 16, 2015 grievance, Kimble immediately removed him from his position as R.D.'s Handicap Assistant and offered him an alternate room or housing unit, away from R.D. However, Plaintiff refused to be moved. When the attack occurred, the unnamed C.O.s immediately verbally interceded, ordering R.D. to stop, before physically intervening and restraining him. Plaintiff was taken to the Medical Department for treatment and R.D. was permanently removed from the unit.

Next, Plaintiff appears to argue that his injuries could have been minimized or avoided if only unspecified C.O.s had intervened sooner to subdue R.D.[22] However, Plaintiff fails to allege how long the purported delay was, and the Defendants' dispositive motion sheds no light on the issue. Nevertheless, the undersigned finds that Plaintiff has not stated a claim for deliberate

---

[22] "I was not rescued by correctional officers until they had yelled for . . . [R.D.] to stop and some time later they left their bubble and arrived to contain . . . [R.D.]." Dkt.# 1-1 at 2.

indifference with regard to delay in breaking up the fight.[23] The Fourth Circuit, like other courts throughout the country "has found that a correctional officer acts in a deliberately indifferent manner if they "stand[] by as a passive observer and *take[] no action whatsoever* to intervene during an assault." Odom v. S.C. Dep't of Corrs., 349 F.3d 765, 773 (4th Cir. 2003) (citing Gordon v. Leeke, 547 F.2d 1147, 1152 (4th Cir. 1978)); see, e.g., Williams v. Mueller, 13 F.3d 1214, 1216 (8th Cir. 1994) ("A prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault." (citations omitted)). Likewise, here, there is no suggestion that the unnamed C.O.s did not act to end the assault. The interval of time between the C.O.s' yelling and their physical intervention is unknown, having not been pled by either party. However, despite the fact that plaintiff sustained what were likely painful injuries, because his injuries were not severe, it suggests that the attack did not go on for very long, and that the C.O.s who responded did so reasonably promptly.

Accordingly, here, all Plaintiff has shown is that three days before the attack, he alerted Unit Manager Kimble that he was being subjected to verbal threats and taunts; these do not violate the Eighth Amendment. McBride v. Deer, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001); Emmons v. McLaughlin, 874 F.2d 352, 353 (6th Cir. 1989). Accordingly, Plaintiff has failed to state a deprivation of a constitutional right, and therefore, Defendant Kimble is entitled to qualified immunity.

With respect to Defendant Mirandy, in addition to Plaintiff's claim that Mirandy "failed to properly instruct his employees in the procedure involved for the handling of potentially violent mentally deficient offender[s]," Plaintiff contends that Mirandy "failed to take corrective

---

[23] Even if Plaintiff had stated such a claim, because he failed to name the C.O.s involved as defendants in this action, the claim would be due to be dismissed anyway.

14

action upon the issuance of [] written grievance[;] . . . [and] failed to properly instruct his underlings and to set in m__[24] approved training and instruction to his subordinates to correct the problem of inmate violence."[25] Here again, Plaintiff has failed to show that Defendant Mirandy knew of a substantial risk of serious harm to him and consciously disregarded that risk. Despite the fact that the defendants have not raised the issue of exhaustion of administrative remedies, a careful examination of the copy of the February 16, 2015 grievance that Plaintiff attached to his complaint does not support Plaintiff's contention that he ever appealed the issue of R.D.'s verbal threats to Warden Mirandy. To the contrary, the grievance states the issue was "resolved" at the Unit Manager level, not "[a]ppealed to the Warden/Administrator;" Plaintiff initialed on the line so indicating, and dated it February 18, 2015.[26] Therefore, despite plaintiff's claim in the complaint that he filed a level 2 grievance to Mirandy and it was "ignored,"[27] it appears Mirandy likely was never notified of the issue at all. Therefore, Mirandy can hardly be found to have known of the risk R.D. posed to Plaintiff, let alone be found to have been deliberately indifferent to it. Again, even if Plaintiff had appealed the issue of the verbal threats to Defendant Mirandy, and Mirandy had denied the grievance by failing "to take corrective action upon the issuance of [] written grievance," that claim would be without merit, because that is not the type of personal involvement required to state a claim. Paige v. Kuprec, *supra* at *1. Accordingly, Plaintiff has failed to state a deprivation of a constitutional right, and therefore, Defendant Mirandy is entitled to qualified immunity as well.

## C. Three Strikes Rule

---

[24] Again, the text of the complaint was cut off on the right margin. See Dkt.# 1 at 8.

[25] Dkt.# 1 at 8.

[26] Dkt.# 1-1 at 3.

[27] Dkt.# 1, § III (E) at 5.

Finally, plaintiff is warned that pursuant to 28 U.S.C. §1915(g) he will not be granted *in forma pauperis* status in the future, if he has "on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." Assuming that this Report and Recommendation is adopted by the District Judge, the instant case will be the first filed by plaintiff in this district that has been dismissed for failure to state a claim upon which relief can be granted. However, plaintiff has already incurred one "strike" in the Southern District of West Virginia.[28]

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the defendant's Motion to Dismiss (Dkt.# 27) be **GRANTED**, and the complaint be **DISMISSED with prejudice** for failure to state a claim upon which relief can be granted.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, **or by December 8, 2015**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

---

[28] See Kinder v. PrimeCare Medical, Inc., S.D. W.Va. Case No. 3:13-cv-31596 (§1983 civil rights action dismissed on March 19, 2005 for the failure to state a claim upon which relief can be granted).

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket. The Clerk is further directed to provide a copy to all counsel of record via electronic means.

DATED: November 24, 2015

/s/ James E. Seibert_____
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE